[No. F005627. Fifth Dist. Feb. 4, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DANNY VALENZUELA MEDINA et al., Defendants and Appellants.

**COUNSEL**

Jeff Reich, under appointment by the Court of Appeal, Gregory H. Mitts and Danny Valenzuela Medina, in pro. per., for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Anthony L. Dicce and Ellen M. Peter, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARTIN, J.**—Appellants Danny and John Medina and codefendants Tomas Moraga and Norma Linda Muniz were charged by information as follows:

Count one charged appellants and Moraga with unlawful possession for sale of heroin in violation of Health and Safety Code section 11351, and count two charged appellants and Moraga with the unlawful sale of heroin in violation of Health and Safety Code section 11352. Counts one and two each contained a special allegation alleging appellants and Moraga possessed for sale 14.25 or more grams of a substance containing heroin within the meaning of Penal Code section 1203.07, subdivision (a)(1).[1]

Count three charged Muniz only with receipt of stolen property, to wit: a Colt .38 revolver, in violation of section 496.

Count four charged appellants, Moraga and Muniz with conspiracy to commit the crimes of possession for sale of heroin and sale of heroin in violation of Health and Safety Code sections 11351, 11352 and Penal Code section 182. Four overt acts were alleged.

Count five charged appellants only with furnishing heroin to a minor in violation of Health and Safety Code section 11353. Count five contained an allegation the furnishing of the heroin to a minor was a serious felony within the meaning of section 1192.7, subdivision (c)(24).

Appellants' motion to suppress evidence pursuant to section 1538.5, submitted on the basis of the preliminary hearing, the affidavit in support of the search warrant, the search warrant and a list of evidence seized pursuant to a stipulation of counsel, was denied by the trial court. The trial court held the appellants did not have standing to challenge the surveillance of others and appellants did not have a reasonable expectation of privacy.

This matter proceeded to jury trial on or about January 15, 1985, at which time appellants again moved to suppress the evidence, which motion was denied. The prosecutor's motion to amend count two of the information to "unlawfully transporting" heroin was granted.

On January 23, 1985, after commencement of the trial, appellants indicated their desire to plead guilty to count two, unlawful transportation of

---

[1] All statutory references are to the Penal Code unless otherwise specified.

heroin, and in exchange for their plea, all other counts and allegations were dismissed.

Both appellants were sentenced to state prison for the middle term of four years. Appellants each filed a timely notice of appeal.

FACTS

In November of 1983, the Bakersfield Police Department began receiving information suggesting appellants were involved in drug trafficking.

In March of 1984, Tom Brown of Kidd Communications contacted Detective Tony Ennis of the Bakersfield Police Department. Mr. Brown told Ennis he had been contacted by the Federal Bureau of Investigation (FBI) which requested Mr. Brown conduct a survey of pagers which were issued by his company to determine if those pagers had an unusually high volume of communication which might suggest to the FBI that the pagers in question were being used for the purpose of trafficking in drugs. Mr. Brown informed Detective Ennis that while conducting the requested survey, he also discovered two pagers rented to Gloria Medina which had an inordinately high volume of communication traffic. Mr. Brown advised Detective Ennis that this high level of pager broadcasts was consistent with the high level of pager communication he had discovered when doing the research for the FBI and, therefore, he contacted the Bakersfield Police Department regarding these pagers to determine if these two pagers rented to Gloria Medina were also involved in narcotics trafficking.

On or about April 2, 1984, Detective Ennis began an investigation of appellants. He and other officers began a surveillance of appellants' homes, their vehicles, and the heroin users in the area. Ennis monitored radio transmissions on the pager frequency. The paging system uses a single radio frequency and all of the transmissions can be heard by anyone listening to this radio frequency. To monitor the transmissions, Ennis used a radio scanner and pagers provided by Mr. Brown. These pagers were duplicates of the ones rented by Gloria Medina who was apparently Danny Medina's wife.

Ennis explained the use of the pagers as follows: Each individual pager is given a designated phone number. When that number is dialed from a telephone, the caller hears a tone and then has 10 seconds to record a message. When the caller hangs up the phone, the message is then relayed to a switching unit. The message is broadcast over the communication airways in the order received preceded by a signal for the particular pager. With the signal, the pager is activated and the speaker automatically opens up so the

message can be heard by the individual in possession of the pager. If the red button on the pager is not depressed immediately following receipt of the message, that individual receives pages meant for other pagers. In other words, anyone who has this type of pager can receive the pages belonging to anyone else who has a similar pager.

The duplicate pagers provided Detective Ennis the advantage of isolating the individual messages being broadcast on that common frequency that were intended for the particular pagers rented to Gloria Medina. There was a possibility of 3,000 pagers on that frequency at a time.

On April 10, 1984, Mr. Brown received three sequentially numbered money orders. Two of the money orders were designated as payment for the rental of the pagers rented by Gloria Medina. The third was designated as payment for a pager rented by Luis Carrillo. Mr. Brown advised Ennis of this development and provided the officer with a duplicate of Carrillo's pager.

Between April 2 and May 17 of 1984, Ennis listened to approximately 300 broadcasts to the 3 pagers. During this time, based on the broadcasts and the surveillance, Detective Ennis became convinced he was observing a heroin trafficking operation. He concluded the pagers were used to direct various deliveries of heroin.

On May 17, 1984, Ennis signed an affidavit in support of a request for a search warrant. The search warrant was issued and then served on May 19, 1984, on various residences, vehicles and individuals, including appellants. Heroin and heroin packaging materials were seized and appellants arrested.

DISCUSSION

I. STANDING

■ In the case of *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744], the California Supreme Court ruled the enactment of article I, section 28, subdivision (d) of the California Constitution, abrogated a defendant's right to object to and suppress evidence seized in violation of the California, but not the federal Constitution. (*Id.* at pp. 885-889.) Accordingly, we must apply federal law to determine the sufficiency of an affidavit supporting a search warrant. (*People* v. *Love* (1985) 168 Cal.App.3d 104, 107 [214 Cal.Rptr. 483].) ■ Initially, each defendant must establish his legitimate expectation of privacy in the items seized and in the place searched. (See *United States* v. *Salvucci* (1980) 448 U.S. 83, 93 [65 L.Ed.2d 619, 629,

100 S.Ct. 2547].) This determination involves two inquiries: First, whether the defendant has exhibited an actual, subjective expectation of privacy, and second, whether that expectation is one society is prepared to recognize as reasonable. (*Smith* v. *Maryland* (1979) 442 U.S. 735, 740 [61 L.Ed.2d 220, 226-227, 99 S.Ct. 2577].)

 To assert his standing, appellant John Medina relies on *United States* v. *Pollock* (9th Cir. 1984) 726 F.2d 1456, in which the defendant's presence on the premises of a home owned by another and evidence he had engaged in activities at the home was held to establish his standing to challenge the evidence seized from that residence. The court held that a defendant who enters into an arrangement that indicates joint control and supervision of the place searched may challenge a search of the place where contraband is concealed. (*Id.* at p. 1465.)

Appellant John Medina argues *Pollock* supports his assertion of standing to seek suppression of the evidence resulting from the police activities in intercepting the pager communications directed to him. He argues he legally possessed the pager, was using it pursuant to an agreement with its lessee, and had, as indicated by his conduct, a subjective expectation of privacy. He also argues an objectively reasonable expectation of privacy exists in the communications to which he was a party in that "no one who obtains a pager expects that someone else will obtain a duplicate pager for the purpose of monitoring his specific communications."

In our view these arguments are without merit. There is no evidence before this court of appellants' subjective intent as to an expectation of privacy. Appellants' covert activity with the assistance of the pagers merely suggests an intention and hope of not being found out. Furthermore, the evidence establishes that any of the persons with similar pagers could listen in to communications by simply failing to press the button which would cease the onflow of messages being transmitted over the speaker of the individual pager. Thus, appellants have failed to establish either prong of the test provided in *Pollock* to determine whether appellants have standing to challenge a warrantless search.

 Appellant John Medina also argues the "Omnibus Crime Control and Safe Streets Act of 1968" (hereinafter Act) (18 U.S.C. § 2510 et seq.), which regulates electronic surveillance and wiretapping, provides an independent basis for standing in this case.

Section 2510 of title 18 of the United States Code provides the following definitions: "(1) '[W]ire communication' means any communication made in whole or in part through the use of facilities for the transmission of

communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications;

"(2) 'oral communication' means any oral communication uttered by a person *exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation*;

". . . . . . . . . . . . . . . . . . . .

"(11) 'aggrieved person' means a person who was a party to any intercepted wire or oral communication or a person against whom the interception was directed." (Italics added.)

Respondent contends appellants have failed to offer sufficient evidence to establish standing as required under section 2510, subdivision (11) of title 18 of the United States Code in that neither appellant produced evidence that either was a "party to any intercepted wire or oral communication or a person against whom the interception was directed." However, at the preliminary hearing, Detective Ennis testified that his observation of appellants and their movements corresponded directly with information transmitted and intercepted via the pagers immediately subsequent to the pager communication. Furthermore, in the affidavit for the search warrant, appellants were described as performing a delivery service for the alleged drug trafficking ring. The affidavit further described the function of the deliverymen to include receiving pager messages and to proceed accordingly. After the monitoring of the pager communications began, appellants were two of the individuals observed during the investigation surveillance. Thus, it appears sufficient evidence was before the trier of fact to establish standing as "aggrieved person[s]" under the Act.[2]

## II. WHETHER PAGER BROADCASTS ARE "WIRE COMMUNICATIONS"

■ Whether the challenged interceptions should be suppressed demands close scrutiny of the statutory requirements concerning wire and oral communications. The determination of whether these communications constitute an "oral communication" or a "wire communication" under the federal eavesdropping statute is critical because the definition of oral communication includes a requirement of reasonable expectation of privacy. (*United States* v. *Hall* (9th Cir. 1973) 488 F.2d 193, 196.) That is, in order

---

[2]Only appellant John Medina asserts his standing on appeal although the rationale would apply to both appellants.

for an oral communication to be protected by the Act, the speaker must have "an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." (18 U.S.C. § 2510, subd. (2).) A "wire communication" has no such restriction in its definition. (18 U.S.C. § 2510, subd. (1).)

In *Hall,* a case relied upon by appellants, defendants therein were convicted of possession of marijuana with intent to distribute. Government agents, without a search warrant, eavesdropped on radio-telephone conversations. Defendants argued that evidence from the warrantless search should have been suppressed. The Ninth Circuit Court of Appeals held that electronic surveillance of radio-telephone conversations which led to arrests violated the Act. The *Hall* court noted that "[b]roadcasting communications into the air by radio waves is more analogous to carrying on an oral communication in a loud voice or with a megaphone than it is to the privacy afforded by a wire." (*Ibid.*) However, although the record before the court was unclear, the *Hall* court determined that some of the conversations intercepted were between two radio telephones while others were between a radio telephone and a regular land-line telephone. The court held that "when part of a communication is carried to or from a land-line telephone, the entire conversation is a wire communication and a search warrant is required." (*Id.* at p. 197.) Thus, the case was remanded to the trial court for a determination of whether the arrests resulted from interceptions of oral or wire communications. If the arrests resulted from wire communications, i.e., those conversations which were carried to or from a land-line telephone, the warrantless interception should be suppressed as to those with standing to object. If the arrests resulted from oral communications, the trial court must then determine whether defendants had a reasonable expectation that the communications were not subject to interception. (*Id.* at p. 199.)

Appellants argue that since the pager broadcast is a 10-second message recorded from a previous telephone call, appellants are within the holding of *Hall.*

However, the *Hall* court found a *conversation,* as opposed to a message, between persons, one of whom was contemporaneously speaking into a hard-wired standard telephone, to be protected. Respondent points out that in the instant case the telephone communication ends when the caller leaves the message, which is recorded, and hangs up the telephone. There is no conversation. The electronic answering service takes a message which will then be broadcast by a radio. The pager cannot be utilized to respond. There is no possibility of conversation to which a hard-wired standard telephone user is a party. Indeed, the telephone link must be severed before the message is broadcast. The initial caller records a message to be later broadcast over radio. The radio broadcasts to the pagers are not wire communications.

In a similar case, the Supreme Court of Florida determined there can be no expectation of privacy in "beeper" messages sent over the airwaves. The Florida court found these "beeper" messages were not protected by Florida's wiretap law which is substantially similar to the relevant parts set forth in 18 United States Code section 2510. (*Dorsey* v. *State* (Fla. 1981) 402 So.2d 1178, 1180, 1182-1183.) The Florida court rejected the decision in *Hall,* choosing to define "wire communications" contained in the Florida statute in a "commonsense and reasonable manner." (*Id.* at p. 1183.) The Florida court construed the prohibition of interception of wire communications "made in whole or in part through the use of facilities for the transmission or communications by the aid of wire . . ." to apply only to so much of the communication as is actually transmitted by wire and not broadcast in a manner available to the public. The court emphasized the "*broadcast* nature of such messages, since one who sends beeper messages should know . . . that such communications are open to any members of the public who wish to take the simple step of listening to them. Such signals clearly lack any expectation of privacy. They are, by the very nature of being broadcast, communications unprotected by any constitutional right or by Florida's wiretap law and therefore are admissible in evidence . . . ." (*Id.* at pp. 1183-1184, fn. omitted.) The "beepers" involved in *Dorsey,* as in the instant case, were a type of pocket pager that one carries on his person and through which he may receive messages. This is accomplished when another person dials the telephone number of the company that distributes the "beepers." The calling party hears a tone and thereafter has 10 seconds in which to announce his message. This message is then converted into radio waves and transmitted to the party with the "beeper" and to any member of the public who has a radio tuned to this frequency. The receiving party can only listen to the message since the "beeper" is a receiver and not a transmitter. The messages were intercepted by the use of a scanner capable of receiving any programmed frequency. (*Id.* at p. 1182.)

In the instant case, as in *Dorsey,* there was not and could not have been any conversation as occurred in *Hall.* As respondent argues, the radio broadcasts to the pagers are not wire communications, by definition, but rather oral communications. At best, only the initial telephonic message to the recorder could properly be deemed a wire communication and the law enforcement authorities did not intercept or eavesdrop on those communications. The trial court properly concluded the *Hall* rationale is inapplicable to the facts of this case. And, as we stated in part I of this opinion, there is no evidence in the record of appellants' subjective intent as to an expectation of privacy.

III. REASONABLE EXPECTATION OF PRIVACY OF PAGER COMMUNICATIONS

As stated previously, section 2510, subdivision (2) of title 18 of the United States Code protects oral communications "uttered by a person exhibiting

an expectation that such communication is not subject to interception under circumstances justifying such expectation." This comports with the requirement under *Katz* v. *United States* (1967) 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507], requiring the speaker to have a subjective expectation of privacy that is objectively reasonable. As also stated previously, broadcasts over the public airways fail to meet this standard. No reasonable person would expect a conversation that could be intercepted by anyone with a radio scanner or another pager to be private. (See *United States* v. *Hoffa* (7th Cir. 1970) 436 F.2d 1243, 1247.)

In *United States* v. *Rose* (1st Cir. 1982) 669 F.2d 23, the court held communication from radio to radio, as between ham operators, is not private communication protected under the Act. In *Rose,* the communications between the defendants were easily monitored. The defendants in that case frequently changed ham radio frequencies and used code words in an effort to avoid monitoring. The court found these facts failed to indicate a reasonable expectation of privacy. (*Id.* at p. 26.)

Thus, we conclude that as appellants' pager broadcasts can be intercepted with a radio or another pager, no reasonable expectation of privacy existed.

IV. WHETHER THE INITIAL INFORMATION FROM KIDD COMMUNICATIONS WAS ILLEGALLLY OBTAINED

Appellant Danny Medina asserts the records initially obtained from Kidd Communications were obtained in violation of appellant's Fourth Amendment rights and that information plus all subsequent evidence resulting therefrom should be suppressed as "fruit of the poisonous tree" pursuant to *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].

Appellant Danny Medina cites *People* v. *McKunes* (1975) 51 Cal.App.3d 487 [124 Cal.Rptr. 126] which involved the investigation of the theft of various instruments and aircraft parts from an aircraft manufacturer during which an investigator for the district attorney secured, without subpena or other court order, telephone company records of calls by a man who had sold the stolen items after their theft. The Second District Court of Appeal reversed the resulting conviction on the basis the defendant's constitutional right of privacy was violated by the government's conduct in securing the telephone company's records without having secured a subpena or other court order. The evidence developed from those telephone records was determined to be "fruit of the poisonous tree" and held inadmissible against the defendant.

Appellant Danny Medina also relies on *People* v. *Chapman* (1984) 36 Cal.3d 98 [201 Cal.Rptr. 628, 679 P.2d 62] involving a prosecution of two defendants for conspiracy to commit bookmaking. The defendants moved to suppress evidence on the basis the police unlawfully obtained the first defendant's name and address from the telephone company without a warrant. Using this information, the police then obtained a warrant to search the first defendant's home and car where they seized physical evidence of illegal betting activity. The California Supreme Court affirmed the trial court's order granting the motion to suppress the evidence and setting aside the information as to the first defendant. The court held the first defendant had a reasonable expectation of privacy in the unlisted information which the telephone company disclosed to the police, this right was protected under the California Constitution, article I, section 13, and the action of the police, in seizing unlisted information without a warrant, consent, or exigent circumstances, violated the Constitution.

These cases are easily distinguishable. Both cases involve action initiated by governmental forces which secured evidence by a warrantless intrusion which violated the defendant's right of privacy. The securing of the records in the instant case was not done at the instigation of governmental agents. While conducting a survey at the behest of the FBI, Mr. Brown discovered the two pagers rented to Gloria Medina transmitted an unusual high volume of broadcasts consistent with the pagers in which the FBI was interested. The record suggests the FBI's investigation was entirely separate and the FBI was uninterested in Gloria Medina's pager traffic. Appellants offered no evidence to the contrary. Thus, Mr. Brown, of his own accord, contacted the Bakersfield Police Department regarding these pagers to determine if they were also involved in narcotics trafficking. Therefore, the information regarding the pager activity on pagers rented by Gloria Medina was obtained as the result of a private individual's independent search rather than as a result of governmental intrusion. No violation of appellant's Fourth Amendment rights occurred.

The judgments of conviction are affirmed.

Woolpert, Acting P. J., and Best, J., concurred.

A petition for a rehearing was denied March 6, 1987, and appellants' petitions for review by the Supreme Court were denied May 14, 1987.