UNITED STATES of America,
Plaintiff–Appellee,

v.

Luis Angel SUAREZ, a/k/a Luis Angel Suarez–Perez, a/k/a Luis Gonzales,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jesus LUCERO–ROMERO,
Defendant–Appellant.

Nos. 89–5169, 89–5170.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 9, 1990.

Decided June 27, 1990.

George Alan DuBois, Jr., Asst. Federal Public Defender, Raleigh, N.C., argued (William E. Martin, Federal Public Defender, Jill M. Wichlens, Asst. Federal Public Defender, Raleigh, N.C., Herman E. Gaskins, Jr., Washington, D.C., on brief), for defendants-appellants.

Thomas Michael Gannon, U.S. Dept. of Justice, Washington, D.C., argued (Sidney Glazer, U.S. Dept. of Justice, Washington, D.C., Margaret Person Currin, U.S. Atty., Raleigh, N.C., on brief), for plaintiff-appellee.

Before RUSSELL, PHILLIPS, and CHAPMAN, Circuit Judges.

PHILLIPS, Circuit Judge:

Luis Suarez and Jesus Lucero–Romero appeal from the judgment entered after their conviction on multiple narcotics charges following a bench trial. Appellants and a third defendant, Victor Zarate–Lopez, were arrested and charged after police, using a "clone" pager, intercepted numbers transmitted to Suarez's pager from various telephones. Appellants moved in district court to suppress evidence obtained as a result of the interception of the electronic communications, arguing that the interceptions violated the Electronic Communications Privacy Act of 1986. The district court rejected that argument, holding that the Act was inapplicable to appellants' case. In the event that the Act was applicable, the court held that recording the intercepted communications was not possible and, alternatively, that the state authorities had satisfactorily explained their failure to comply with the Act's proscriptions. We affirm on the narrow ground that recording was not possible within the meaning of the Act.

## I

On September 22, 1988, a Wake County, North Carolina, assistant district attorney filed a petition in Superior Court seeking authorization to install a "pen register type system known as 'Group Call' " on a pager believed to be in Suarez's possession. In a supporting affidavit, a Raleigh police officer averred that Suarez carried a pager to receive coded messages transmitted by telephone from drug couriers. The pager Suarez allegedly carried was a "digital display" model, which displays numbers transmitted by the caller, and police sought authorization to use a "clone pager" that would display the same messages transmitted to Suarez's pager. The court authorized use of such a system for ninety days beginning September 22, 1988.[1]

---

1. The court ruled that the installation of a pen register by law enforcement officers was constitutionally permissible, citing *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), and *United States v. New York Telephone*

A digital display pager displays the numeric characters transmitted electronically by the pager company based on numbers punched in on a touch-tone telephone by the sender of the message. The clone pager obtained by the police received and displayed the same information transmitted to the suspect pager, but had no capability to permanently record or store the numbers received. Consequently, police officers monitoring the clione pager kept a written log of the numbers transmitted to Suarez's pager, though they eventually stopped recording known duplicate numbers.

On November 8, 1988, police intercepted a message to the pager that included the number of a pay telephone in the Charlotte, North Carolina, airport. Further investigation showed that Suarez was booked on a flight from Phoenix to Raleigh, with an intermediate stop in Charlotte. When Suarez arrived in Raleigh, police detained and questioned him, but did not arrest him. Suarez checked into a motel, but later was observed walking to the residence of his girlfriend at 5600 Duraleigh Road.

On November 9, two officers were monitoring the pager. The officers did not have the log book that had been used to record numbers previously intercepted. As they intercepted incoming numbers, one officer wrote the numbers on the back of an envelope; the other officer later copied the numbers from the envelope.[2] Investigation by the officers indicated that two calls placed to Suarez's pager on the morning of November 9 came from a local Ramada Inn and that Lucero–Romero was registered there. The officers went to the Ramada and observed Lucero–Romero and Zarate–Lopez leave the motel with several large suitcases and check into the Comfort Inn across the street. The officers soon intercepted a call from the Comfort Inn to Suarez's pager.

Based on their observations and previously gathered information, state law enforcement officers sought and were issued a search warrant for Lucero–Romero's room at the Comfort Inn. The officers searched the room and seized a quantity of marijuana. The police then sought a warrant to search the residence at 5600 Duraleigh Road. In a supporting affidavit, Agent Truax of the North Carolina State Bureau of Investigation recounted in detail the information gathered from other law enforcement offices, from informants, from monitoring the pager, from surveillance of Suarez and the other suspects, and from the search of Lucero–Romero's room. Agent Truax further averred that neither Suarez nor his girlfriend had a known source of legitimate income, yet Suarez traveled extensively by air across the country and spent large sums of money on his girlfriend, who was attempting to purchase a new home with cash. Agent Truax believed that the search of 5600 Duraleigh Road would reveal "drugs, cash, financial transaction records and paper writings that will further tie Luis Suarez and [his girlfriend] to the ... marijuana seized and other shipments of narcotic drugs into the Raleigh area in the past." When police obtained and executed the warrant, they seized approximately $100,000 and a small amount of marijuana.

Appellants and Zarate–Lopez were indicted for conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, and interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a); Lucero–Romero and Zarate–Lopez were also charged with possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). Before trial, Suarez moved to suppress evidence seized from the Duraleigh Road residence; the court denied this motion. Appellants also moved to suppress evidence seized as a result of the interception of the electronic communications to Suarez's pager. Appellants argued that the procedures police followed violated the Electronic Communications Privacy Act of 1986. The court de-

---

*Co.,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

**2.** The envelope on which the numbers intercepted were originally transcribed was inadvertently thrown away, but the officers were able to reconstruct all but one of the numbers they intercepted on the morning of November 9.

nied the motions, ruling that because state court authorization of the system to intercept the messages occurred before the effective date of the Act, messages intercepted under valid authorization after the effective date of the Act were not covered by the Act. Even if the Act were applicable, the court ruled that suppression was not warranted for failure to observe the Act's sealing requirements. The court found that recording the information intercepted by the police's clone pager was not possible and that the written log kept could not serve the purpose of recording because it was subject to editing and alterations. The court also ruled that the authorities satisfactorily explained their failure to seal the paper recordings they did make.[3]

The defendants waived their right to a jury trial. The court convicted the defendants on the counts as charged after a bench trial. Suarez was sentenced to 43 months imprisonment, followed by five years supervised release, and fined $100,000; Lucero–Romero was sentenced to 108 months imprisonment, to be followed by five years supervised release. On appeal, Suarez and Lucero–Romero challenge the court's suppression rulings.[4]

## II

### A

Title I of the Electronic Communications Privacy Act of 1986 ("the Act") amended Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III")[5] to protect against unauthorized interception of "electronic" communications.[6] Congress found that amendments to Title III were needed "to update and clarify Federal privacy protections and standards in light of dramatic changes in new computer and telecommunications technologies." S.Rep. No. 541, 99th Cong., 2d Sess. 1, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3555. Voice communications transmitted via common carrier were protected under the 1968 act, but "there [were] no comparable Federal statutory standards to protect the privacy and security of communications transmitted by new noncommon carrier communications services or new forms of telecommunications and computer technology." S.Rep. No. 541, 99th Cong., 2d Sess. 5, *reprinted in id.* at 3559. The legislative history specifically refers to paging devices and makes clear that display pagers are included within the Act's coverage. *See* S.Rep. No. 541, 99th Cong., 2d Sess. 10, 15, *reprinted in id.* at 3564, 3569.[7]

The Act provided that its amendments to Title III would generally take effect ninety days after its enactment date, and would "in the case of conduct pursuant to a court order or extension, apply only with respect to court orders or extensions made after this title takes effect." Pub.L. No. 99–508, § 111(a), 100 Stat. 1848, 1859 (1986). The legislative history confirms the intent that "existing court orders would not be affected by [the] changes and on-going investigations would not be hindered." S.Rep. No. 541, 99th Cong., 2d Sess. 35, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3589. Congress then provided a special effective date provision for state authorized interceptions of electronic communications.

3. The court did rule that appellants had standing to assert a fourth amendment claim, but held that no official misconduct occurred that would provide the basis for such a claim, and that even if there was a fourth amendment violation, suppression was not warranted under the rationale of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Appellants have not challenged this ruling on appeal.

4. Zarate–Lopez did not appeal his conviction.

5. Title III is codified as amended in chapter 119 of Title 18, United States Code.

6. "Electronic communication" is generally defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

7. The parties agree that the Act covers the digital display pagers used in this case. By contrast, "tone only" pagers are excluded from the Act's coverage. *See* 18 U.S.C. § 2510(12)(C).

Any interception pursuant to section 2516(2) of title 18 of the United States Code which would be valid and lawful without regard to the amendments made by this title shall be valid and lawful notwithstanding such amendments if such interception occurs during the period beginning on the date such amendments take effect and ending on the earlier of—

(1) the day before the date of the taking effect of State law conforming the applicable State statute with chapter 119 of title 18, United States Code, as so amended; or

(2) the date two years after the date of the enactment of this Act.

Pub.L. No. 99–508, § 111(b), 100 Stat. 1848, 1859 (1986). The Act superseded state laws with respect to electronic communications, and states were required to enact statutes at least as restrictive as the new federal law before they could authorize their own courts to issue interception orders. Congress deemed it necessary to allow states two years to bring their laws into conformity with the new federal law because of the "substantial changes" wrought by the Act. *See* S.Rep. No. 541, 99th Cong., 2d Sess. 35, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3589. Neither the statute nor the legislative history referenced any extension for ongoing interceptions authorized by state courts prior to the effective date of the Act for that state.[8]

The substantive provisions of Title III were amended to include reference to "electronic" communications. Thus the procedures for the lawful interception of electronic communications are codified in 18 U.S.C. § 2518. In addition to prescribing the procedures for obtaining the court order necessary for lawful interception of electronic communications, § 2518 provides that the contents of any intercepted electronic communication must be sealed, "if possible."

The contents of any ... electronic communication intercepted by any means authorized by this chapter shall, *if possible*, be recorded on tape or wire or other comparable device. The recording of the contents of any ... electronic communication under this subsection shall be done in such way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. ... The presence of the seal provided for by this subsection, or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any ... electronic communication or evidence derived therefrom under subsection (3) of section 2517.

*Id.* § 2518(8)(a) (emphasis added). Where the statutory procedures have been followed, § 2517(3) permits testimony concerning the contents of intercepted electronic communications and derivative evidence therefrom. *Id.* § 2517(3).

The primary thrust of § 2518(8)(a) "is to ensure the reliability and integrity of evi-

---

8. Congress also added two new chapters to the federal criminal code as part of the Electronic Communications Privacy Act. Title II of the Act creates a criminal offense for unlawful access to stored wire and electronic communications and transactional records. Title II's effective date was to be 90 days after the date of enactment; again, the new law would apply "only with respect to court orders or extensions made after this title takes effect." Pub.L. No. 99–508, § 202, 100 Stat. 1848, 1868 (1986). Title III of the Act added a second new chapter to cover "pen registers" and "trap and trace devices." For this new chapter, as for the amendments to chapter 119, Congress provided a dual effective date scheme: for federal authorizations, the new law would be effective 90 days from the date of enactment, applying only to court orders or extensions for pen registers or trap and trace devices made after the effective date; for state authorizations, "[a]ny pen register or trap and trace device order or installation which would be valid and lawful without regard to the amendments made by this title shall be valid and lawful notwithstanding such amendments if such order or installation occurs" during the period from the effective date of the Act to the earlier of the date of enactment of "changes in State law required in order to make orders or installations under Federal law as amended," or two years from the date of enactment of the Act. Pub.L. No. 99–508, § 302, 100 Stat. 1848, 1872 (1986).

dence obtained by means of electronic surveillance." *United States v. Ojeda Rios*, —— U.S. ——, ——, 110 S.Ct. 1845, 1849, 109 L.Ed.2d 224 (1990); *see also* S.Rep. No. 1097, 90th Cong., 2d Sess. 105, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2193. Congress explicitly distinguished in § 2518(8)(a) the act of intercepting a communication from the act of recording the intercepted communication. *See United States v. Harpel*, 493 F.2d 346, 350 (10th Cir.1974); *In re John Doe Trader Number One*, 722 F.Supp. 419, 422 (N.D. Ill.1989); *see also* 18 U.S.C. § 2510(4) (definition of "intercept"). The language of the statute makes clear Congress' recognition that recording the contents of an intercepted communication may not in all circumstances be possible. Thus the mandate to seal, required in order to protect the reliability and integrity of the evidence, is initially contingent upon the possibility of recording the intercepted communication. The possibility, or practicability,[9] of recording is measured by the capabilities of "tape, wire or other comparable device" to record the intercepted communication.[10]

■ Section 2518(8)(a) also contains its own exclusionary remedy if the timely seal required by the section, or a "satisfactory explanation for the absence thereof," is found lacking. *See United States v. Mora*, 821 F.2d 860, 866 (1st Cir.1987); *United States v. Diana*, 605 F.2d 1307, 1312 (4th Cir.1979).[11] The satisfactory explanation exception requires the government to explain not only why a delay in sealing or the failure to seal occurred, but also why the delay or failure is excusable. *See United States v. Ojeda Rios*, —— U.S. at ——, 110 S.Ct. at 1849-51. If the sealing requirements are not followed, a principal inquiry in determining whether the government has provided a satisfactory explanation for its failure to seal is whether the integrity of the recording was preserved. *United States v. Diana*, 605 F.2d at 1314. But the government must also demonstrate "good cause" for the failure. *United States v. Ojeda Rios*, —— U.S. at ——, 110 S.Ct. at 1850. Among the factors relevant in determining whether the government has presented a satisfactory explanation for its failure to seal are the length of any delay before sealing, the care taken in handling the recordings, prejudice to the defendants, any tactical advantage accruing to the government, and whether deliberate or gross dereliction of duty or honest mistake caused the failure to file. *See United States v. Mora*, 821 F.2d at 868-69; *United States v. Diana*, 605 F.2d at 1314-16; *see also United States v. Ojeda Rios*, —— U.S. at ——, 110 S.Ct. at 1851 (government's "objectively reasonable" misapprehension of statute's requirements is satisfactory explanation for delay in sealing).

## B

The Electronic Communications Privacy Act became law on October 21, 1986. The North Carolina legislature did not enact

---

**9.** The legislative history of the Omnibus Crime Control and Safe Streets Act of 1968 indicates that Congress sought to require recording "if practicable." *See* S.Rep. No. 1097, 90th Cong., 2d Sess. 105, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2193.

**10.** The statute does not define "record" or "comparable device"; likewise, the legislative history is silent on Congress' intended meaning for these terms.

**11.** Title III also contains a general statutory exclusionary rule, codified at 18 U.S.C. § 2515, which prohibits the admission into evidence of the contents of intercepted wire or oral communications if disclosure of that information "would be in violation" of Title III. Section 2518(10)(a) complements § 2515, providing explicit grounds on which an "aggrieved person"

may move to suppress certain intercepted wire or oral communications. 18 U.S.C. § 2518(10)(a). Neither section was amended to include "electronic communications" within its scope; rather, § 2518(10)(c) was added to define the exclusive remedies with respect to electronic communications.

> The remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for nonconstitutional violations of this chapter involving such communications.

18 U.S.C. § 2518(10)(c). We think Congress intended, notwithstanding the legislative history, *see* S.Rep. No. 541, 99th Cong., 2d Sess. 23, *reprinted in* 1986 U.S.Code Cong. & Admin. News 3555, 3577, to extend the statutory exclusionary remedy in § 2518(8)(a) to electronic communications.

during the two-year grace period extended by Congress conforming legislation governing the interception of electronic communications.[12] Therefore, the effective date of the Act for purposes of interceptions authorized by North Carolina courts was October 21, 1988. The state court order authorizing the electronic surveillance in this case was issued September 22, 1988; the relevant interceptions were made on November 8 and 9.

■ Appellants contend that the "plain language" of the statute compels the conclusion that *interceptions* of electronic communications after the effective date of the Act are governed by its proscriptions and that the district court erred in holding that the Act was not applicable in this case.[13] We need not address this question of statutory interpretation in order to decide this case. We agree with the district court's alternative rationale that, assuming the Act would apply to the state authorized interceptions at issue, the sealing requirements in § 2518(8)(a) were never invoked because recording the contents of the communications intercepted in this case was not possible.

Section 2518(8)(a) requires that the contents of intercepted electronic communications be recorded "if possible ... on tape or wire or other comparable device." The district court found as a fact, and appellants have not disputed, that the clone pager used by the North Carolina authorities in this case had no capability to record or store in memory for any substantial length of time the numeric messages intercepted.

The state authorities instead transcribed in a log book the messages appearing on the screen of the clone pager. The term "record" is not defined in Title III, but the language of § 2518(8)(a) and the legislative history of the Act compel the conclusion that transcribing by hand in a log book the images appearing on a display pager is not recording on a comparable device within the meaning of that section. *See United States v. Paredes–Moya,* 722 F.Supp. 1402, 1407 (N.D.Tex.1989). Recording by hand simply cannot be done, as the statute requires, "in such way as will protect the recording from editing or alteration." 18 U.S.C. § 2518(8)(a); *see also* S.Rep. No. 1097, 90th Cong., 2d Sess. 105, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2112, 2193 ("The recording *must be made* in such a way as will protect it insofar as possible from editing or alteration.") (emphasis added). Rather than mechanically capturing the electronic communication as received, manual transcription interposes an agent and produces inherent problems of editing or alteration. Though the meaning of "other comparable device" must be determined in the absence of a statutory definition, we conclude, based on the phrase's context, that a log book simply cannot be considered a "comparable device" to a tape or wire recorder.

The statute's whole premise is that the evidentiary reliability of particular electronic communications can be ensured by two means: (1) their mechanical recordation as received, which ensures their

12. The North Carolina legislature did enact legislation governing the installation of trap and trace devices. *See* N.C.Gen.Stat. §§ 15A–260 to –264 (1988).

13. Briefly, appellants argue that § 111(a) of the Act plainly excepts conduct pursuant to valid federal court orders issued before the ninety-day grace period expired while, in contrast, § 111(b) contains no specific reference to conduct pursuant to pre-existing state court orders. Appellants' explanation for distinguishing between federal and state authorizations is based on the dual effective date scheme—Congress granted the exception for conduct pursuant to valid federal court orders because of the relatively brief ninety-day grace period before the Act would apply, but Congress adopted a bright line rule focusing only on the date of interception pursuant to state authorizations because states were given up to two years to adopt conforming legislation.

The government argues in response that the statutory scheme as a whole compels the conclusion that Congress did not intend to interfere with ongoing investigations pursuant to pre-existing court orders. Rather than impute an intention inconsistent with that explicitly expressed elsewhere in the Act, the government contends that the effective date provision for state authorizations of interceptions of electronic communications should be construed to exempt all interceptions pursuant to valid state court orders issued prior to the effective date of the Act.

original integrity; followed by (2) the relatively prompt sealing of the mechanical recordation. In this way, the opportunity for human alterations is completely avoided at the point of interception and minimized thereafter. That premise, hence the statute's intended application, is completely undercut where simultaneous mechanical recordation is impossible, and human alteration made possible in the very act of manual "recordation." The complete futility of any sealing requirement in that closing-of-the-barn-door situation is the best indication that the statute imposes none.[14]

Appellants contend that such a construction defeats the underlying purpose of § 2518(8)(a) to preserve the integrity and reliability of electronic communications offered as evidence. Since "recording" by hand was "possible," as shown by the log book transcriptions that were made, appellants argue that, such as it was, this "record" should have been sealed to preserve its reliability and integrity. The failure to seal,[15] following their line of reasoning, therefore violated the statute.

The initial premise of this line of argument, however, is faulty—here there was no recording, nor was one possible, by a device comparable, in the critical way above noted, to a tape or wire recorder. Sealing can only prevent the later alteration of a communication recorded as received; it cannot preserve what is inherently subject to alteration in the very act of recording.[16]

## III

Suarez also contends that the district court erred in failing to suppress the evidence seized from his girlfriend's residence at 5600 Duraleigh Road. We agree with the district court that probable cause supported the issuance of the warrant to search that residence.

■ ■ A search warrant issues upon a showing of probable cause to believe that a legitimate object of the search is located in a particular place. E.g., Steagald v. United States, 451 U.S. 204, 213, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). Probable cause to search exists when, at the time the magistrate issues the warrant, there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search. E.g., Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). A magistrate's finding of probable cause is subject to great deference on review. Id. at 238–39, 103 S.Ct. at 2332.

■ Agent Truax's affidavit amply supports the magistrate's finding of probable cause to search the residence at 5600 Duraleigh Road. The affidavit detailed information that Suarez was a drug smuggler, that his girlfriend, on whom he was spending large amounts of money, lived at 5600 Duraleigh Road, that neither he nor his girlfriend had a known source of legitimate income, that information obtained from the clone pager led to the determination that Suarez was coming to Raleigh and that he went to the residence upon his arrival, and that calls to Suarez's pager from a known drug smuggler and associate led to the

---

**14.** Our holding in this case obviates any need to consider the district court's alternative ruling that, assuming § 2518(8)(a) applies, the authorities presented a "satisfactory explanation" for their failure to meet the sealing requirements of the statute.

**15.** Appellants state that the log book was never sealed. The government responded that the log book was sealed on or about November 10, 1988, when the federal criminal complaint was filed. In view of our disposition of this case, we need not determine whether this was a "delayed sealing" or a "failure to seal" case.

**16.** If some broader purpose of the legislation is being defeated by this construction, that stems from its failure to have prescribed a method for safeguarding the integrity and reliability of evidence of communications not subject to mechanical recordation simultaneously with their interception. As the statute is now drawn, it simply does not attempt to control by any requirement of simultaneous "recordation" the use in evidence of communications not subject to mechanical recordation. Protection against any risks of unreliability in such evidence must be found in other parts of the overall statutory scheme and in traditional techniques of advocacy.

arrest of the associate and the seizure of a large quantity of marijuana. On this basis, Officer Truax believed that drugs, cash, and records would be found at the residence tying Suarez to the marijuana seized and other shipments of illegal narcotics.

Suarez appears to argue that the affidavit does not provide a sufficient basis to believe that cash or records would be found at the specific house sought to be searched. As noted, however, Suarez was placed at the home and calls were made to him that led to the arrest of an associate and the seizure of a quantity of marijuana. Suarez and his girlfriend were spending money without legitimate sources of income. The district court did not err in finding probable cause and denying the motion to suppress the evidence seized from the Duraleigh Road residence.

## IV

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.